Filed 6/17/13  In re David W. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION SEVEN

| | |
|---|---|
| In re DAVID W., a Person Coming Under the Juvenile Court Law. | B243483 |
| | (Los Angeles County Super. Ct. No. CK85636) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>L.W.,<br><br>    Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Jacqueline Lewis, Juvenile Court Referee.  Affirmed.

Law Offices of Arthur J. LaCilento and Arthur J. LaCilento, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jeanette Cauble, Senior Deputy County Counsel, for Plaintiff and Respondent.

Marissa Coffey, under appointment by the Court of Appeal, for Respondent David W. (minor).

————————————————

## INTRODUCTION

In February of 2011, the juvenile court declared five-year-old David W. a dependent pursuant to Welfare and Institutions Code section 300 and ordered the parents to share custody of the child.[1]  Approximately one year later, David's therapist reported that the parents' ongoing, combative relationship had caused the child severe emotional distress, ultimately culminating in a psychiatric hospitalization.  Based on this new information, the juvenile court ordered the child detained and the Los Angeles County Department of Children and Family Services (DCFS) filed a section 342 petition; following a contested adjudication and disposition hearing, the court sustained the petition and detained the child.

Father appeals the juvenile court's jurisdictional and disposition orders, arguing that: (1) the court's orders were not supported by substantial evidence; (2) the court exceeded its authorities by ordering DCFS to file a section 342 petition; and (3) the juvenile court violated the time limitations set forth in section 352, subdivision (b).  We affirm the court's orders, concluding that although the juvenile court violated section 352, father suffered no prejudice.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  *Initial Section 300 Petition*

#### 1.  *Summary of the initial section 300 petition and detention*

##### a.  *Summary of initial referral and DCFS investigation*

L.W. (father) and J.F. (mother) are the parents of David W., who was born in 2005.  Mother was previously married to M.B., with whom she had a daughter, V.F., who was born in 1996.

On November 15, 2010, DCFS received a referral alleging that father placed David, then five, and V.F., then 14, in a dangerous situation involving an automobile.

---

[1]     Unless otherwise noted, all further statutory citations are to the Welfare and Institutions Code.

The report indicated that, on November 9th, M.B. was inside his home gathering items to load into mother's pick-up truck. David and V.F. were both sitting in the vehicle, which was parked in the driveway. While M.B. was inside the house, father entered the vehicle and turned on the engine. Upon hearing the engine, M.B. ran outside and jumped into the open bed of the truck. Father began to drive the vehicle down the street with M.B. banging on a rear window, yelling at father to stop. Father eventually stopped the truck, "exchanged words with [M.B.]" and then drove back to M.B.'s residence. After M.B. and V.F. exited the vehicle, father and David drove away. M.B. reported the incident to the police.

On November 30, DCFS interviewed mother, M.B., David and V.F. regarding the incident. Mother reported that M.B. had called her immediately after the incident and said that he thought father was trying to kill him by throwing him off the back of the truck. Mother further reported that V.F. was visibly upset by the incident and that David was crying and complaining of abdominal pain. According to mother, neither child had a seat belt on when the father began driving the vehicle.

Mother told DCFS that her relationship with father had been "on and off for about eight years" and had "consisted of domestic violence in a physical, sexual, verbal and emotional manner." Mother stated that during a recent trip to Israel, father had head-butted her twice in the forehead. On prior occasions, he had allegedly forced mother "to engage in sexual activity against her will" and threatened her life.

During his interview with DCFS, M.B. stated that he had feared for his life while on the back of the truck, explaining that both children could see him "hanging from a bar" and that V.F. began to cry and shake hysterically, which then caused David to become upset. V.F. provided similar statements, informing DCFS that she was sitting in the backseat of the vehicle when father opened the driver side door, entered the truck and began driving away. V.F. stated that she saw M.B. (her father) holding onto the back of the vehicle, yelling at father to stop. V.F. feared that father was trying to kill M.B. After traveling several blocks and making multiple turns, father stopped the truck. Shortly

3

thereafter, V.F. realized "what had happened" and became hysterical. She reported that David was also upset and crying.

David reported that he was sitting in the truck and "was really scared" because M.B. was "screaming" from the "back." David also reported that his father could be "really mean" and that, sometimes, he was "scared" of father. David explained that, on one prior occasion, father and mother were pulling each of his hands in separate directions and he thought, "'I can't be two people, I'm only one. I can't go two places. Almost like they were trying to split me in half.'"

On December 2, 2010, DCFS interviewed father, who denied M.B.'s version of the incident. Father alleged that he and the mother owned the truck together, and that he had been trying to get it back for a long period of time. Father asserted that, after entering the vehicle, he asked V.F. to get out, but she refused to do so. Father alleged he "pulled the car out of the driveway into the alley way and drove approximately two or three homes before realizing [M.B.] was in the back of the car." Father claimed that "because [M.B.] was so upset he upset [V.F.] which then upset . . . David." Father also stated that he believed mother had "coached" David on what to say about the incident.

Father denied ever having been violent with mother and claimed that she had been violent with him. He also reported that mother had previously scratched his vehicle, broken into his home and been charged with a DUI. According to father, mother was an alcoholic and employed as a "call girl" or "prostitute." When DCFS asked mother about these allegations, she admitted that she had scratched father's car "out of anger" and had "trespassed" into his house to retrieve some personal belongings. She also admitted that, in 2003, she was found to be driving with a blood alcohol content of .08 and was charged with "reckless driving." She denied being a call girl or a prostitute.

DCFS also interviewed a neighbor of M.B. who was in her house at the time of the incident. The witness stated that she heard a truck "screeching" around a turn, and then saw the truck stopped in front of her house, with a man sitting in the driver's seat and two children in the passenger seats. A second man was yelling that he was going to call the police.

4

*b. Summary of DCFS's section 300 petition and temporary detention hearing*

On December 6, 2010, DCFS filed a petition alleging that David fell within the jurisdiction of the juvenile court pursuant to section 300, subdivisions (a) and (b).  The petition included an identical allegation under each subdivision asserting that father had placed the child at risk during the driving incident and that the parents had both engaged in "violent altercations in the child's presence."

DCFS filed a detention report in support of the petition containing a summary of its initial investigation.  The report concluded that David was "at substantial danger" of physical and emotional harm if left in the parents' custody and recommended that he be removed from their homes.  At the detention hearing, the court found  there was prima facie evidence that David was a "a person described by section 300 subdivisions (a) and (b) and that continuance in either parent's home would be contrary to the child's welfare."  The court vested temporary custody of David in DCFS and granted the parents reunification services and monitored visits.

*2.     Jurisdictional and disposition report*

On December 20, 2010, DCFS filed a jurisdictional and disposition report summarizing additional interviews that it had conducted with David, V.F., father, mother, M.B. and an associate of father.  Contrary to the statement made in his initial interview, David told DCFS he was "not scared" during the incident and that nobody was yelling.  According to David, M.B. had been "flying on the car because he wanted to borrow it but my dad said he couldn't."  David also stated that he had never been physically disciplined by his parents and had never seen them engage in any violent altercations.

V.F. reported that father entered the car, smiled at David and then turned on the engine.  While he was driving, V.F. could clearly hear M.B. saying "stop the car."  Father, however, smiled and "giggled," and started to drive faster, while "turning and turning again."  During this time, the children were not wearing seat belts.  V.F. stated

that she was "hysterical" during the incident, but that David just had a "shocked expression."

Father denied that he had driven in a dangerous manner. He claimed that he had only driven about 200 feet, without turning or "driv[ing] fast." He also reported that the tires of the vehicle screeched because "there was a screw in the tire and 'the low pressure it creates a screech with a mild turn because there is not enough air in the tire.'" Father further reported that the engine was on for less than 60 seconds and that "[t]he only chaos was because [M.B.] was screaming on the truck." He alleged neither of the children were afraid and denied that he had swerved the vehicle or that he had been trying to eject M.B. from the bed of the truck. He also alleged that David was wearing his seatbelt, but could not recall whether V.F. was wearing her belt.

Father also told DCFS that mother had a problem with alcohol that was detrimental to David. Father provided DCFS a declaration in which he repeated his allegations that mother was a prostitute, that she had broken into his home and that she had scratched his car. He also submitted a letter from David's private school stating that mother had repeatedly brought the child to school late. Father submitted numerous additional declarations attesting to his character and parenting skills.

In her interview with DCFS, mother stated that she had been married to M.B. between 1996 and 2001 and then met father in 2003. Mother lived in father's apartment for five years and continued to receive financial support from him. Mother alleged that during a recent trip to Israel, she found father talking on the phone to another woman and became upset. Mother left the hotel and, when she returned, father pulled her hair, head-butted her twice and then pretended he was going to hit her with his fist. Mother stated that father had never actually raped her, but had demanded to have sex with her. Father denied all of these allegations.

M.B. told DCFS that, after he jumped into the cab of the truck, the vehicle began accelerating and turning sharply to the right and then to the left. He stated that he was screaming and could see both children in the car, who looked scared and were not wearing their seatbelts. When father stopped the car, M.B. told him he was going to call

the police. V.F. was crying and David appeared to be in shock. M.B. also said he would have been ejected from the rear of the vehicle if he had not grabbed onto a railing. Father suggested that he and M.B. talk about the incident over coffee. M.B., however, elected to call the police.

Finally, an associate who had traveled with father to retrieve the vehicle told DCFS that he saw M.B. get into the back of the truck, then knock on a window, which caused father to immediately stop. The associate alleged that he had not seen the vehicle suddenly start, stop or swerve, but admitted that he had lost sight of the vehicle before it came to a complete stop.

DCFS reported that David had been placed in a foster home and recommended that the court declare him a dependent and provide reunification services for both parents. At a December 22, 2010 hearing, David's attorney requested that he remain in the foster home, where he had been doing well. The court ordered David to remain in the foster home and continued the matter.

### 3. The parents' mediated agreement pleading no contest to the petition

On February 2, 2011, the parents entered into a mediated agreement pleading no contest to an amended section 300 petition that contained a single allegation under subdivision (b): "The child's parents have exposed the child to the risk of physical and emotional harm by engaging in high conflict behavior on an on-going basis, including at times in the child's presence. Such conduct includes but is not limited to an incident in November 2010 when the child's father erratically drove a vehicle belonging to both parents while David and another child were in the truck. David was not properly secured in appropriate safety restraints, and the incident was frightening. On a different occasion, in the child's presence the mother damaged the father's vehicle by intentionally scratching it with a key. The parents' endangering and detrimental conduct places the child at risk of physical and emotional harm."

Pursuant to the mediated agreement, the court ordered the parents to share custody of David under a pre-negotiated, written schedule. The parents were also ordered to

7

complete parenting classes, participate in individual and conjoint "co-parenting" counseling and ensure that David attend individual therapy. Father was also ordered to complete an anger management class and mother was ordered to participate in domestic violence victims counseling. The court set a section 364 status hearing for August 10, 2011.

### 4. Section 364 status reviews

#### a. August 2011 status review

On August 8, 2011, DCFS filed a status review report indicating that David had attended seven individual therapy sessions with Angela Bissada, who began treating the child in March of 2011. In a progress letter written in May of 2011, Bissada informed DCFS that David had "expressed his belief that all parents '"fight and yell" and his mom and dad never stop fighting because they are "mom and dad."'" David had also "recalled memories of ongoing parental conflict," which "heighten[ed] his anxieties[,] . . . . distorted [his] concept of adult relationships" and caused him to be "quite confused and intense in his parents' presence." Bissada recommended that the parents refrain from expressing their anger toward one another in the child's presence.

DCFS's report stated that, during the supervision period, the parents had "focused their energies on past incidents, their mutual resentment and anger and hostility as it pertains to their ongoing challenges." The parents, however, had also made "concerted efforts to curtail their anger in the presence of [David]," which caused the child to "demonstrate[] a more positive outlook." DCFS also reported that the child indicated he enjoyed his time with mother and father.

DCFS further reported that mother had been attending weekly individual therapy and was almost finished with a domestic violence counseling class. Mother informed DCFS that these treatment programs had provided her insights into how to identify her anger and improve her communication with father. Father had also been attending individual therapy and completed an anger management course. His individual therapist,

8

Natalie Cohen, told DCFS that father had "admitted to making a mistake in the past and is currently making progress."

In its assessment and evaluation, DCFS concluded that although the "parents continue to experience a certain level of discord and blaming behavior, they continue to make concerted effort in their respective treatment programs. . . Despite this fact, the parents continue to have significant problems with their communications and co-parenting issues."

Shortly before the hearing, DCFS submitted a "last minute information," which included an additional progress letter from Bissada and a progress letter from the parent's conjoint therapist, Ian Russ. Bissada's letter stated that, "[a]t the outset of treatment, David would report witnessing multiple conflicts between his parents which involved yelling, screaming, his being physically pulled between them and of police involvement." Bissada reported that, over the prior several weeks "David's direct expression of confusion, anxiety and sadness as to his parents' conflict ha[d] decreased . . . ., expressing [only] that [parents] are not fighting as much, that they are not friends and that he does not think they ever will be."

Bissada's letter indicated David had begun expressing his feelings through pictures and stories, which had "recurring themes of a child having to choose between two parents who live in different homes, of parents being placed in jail and the child having to help them escape, of many explosive battles between 'bad and good guys' wherein in the endings frequently involve the 'bad guys or horrible sharp clawed monsters . . .', destroying the entire world and all of its inhabitants."

Bissada further stated that although the parents were making an effort not to engage in "overt conflict in David's presence, . . . his current focus on story themes of battles between bad and good likely project his continued confusion and fear of his parents' relationship becoming catastrophic." Bisada believed, however, that with continued "effort not to engage with one another during visit transitions, to not speak by phone in David's presence or to speak about the other parent negatively in his presence,

9

David will develop a more stable outlook on the future" and "gain a more age appropriate and realistic understanding of conflict resolution."

Ian Russ's progress letter reported that the parents had attended approximately 30 sessions of conjoint therapy, which began in January of 2011. Russ stated that the parents appeared to be "more cooperative with each other and more able to work in David's best interest." Mother, however, was still having "difficulty putting David's interests in front of her own wishes," insisting, for example, that if David was to receive more visitation time with father during Father's Day, then she must receive back the same amount of time at some point in the future. Russ reported that the tension and conflict had been reduced significantly, even during "face to face exchanges." Parents had also improved at "making joint decisions in David's best interest," improved their communication skills and reduced their impulsivity, although mother was reported to be "considerably more impulsive than father."

### b. *November 2011 status review*

In November of 2011, DCFS submitted a status review report indicating that David had seen Bissada only four times during the three month supervision period. According to the father, "the holidays made it difficult for him to bring David." Bissada provided a progress letter stating that parents told David they would never live together in the same house, which made him "sad but glad that they are not fighting as much as they used to." Bissada further reported that there had been a "significant decrease in David's dictating and illustrating stories . . . that involve themes of conflict between 'bad and good guys', jail and destruction. He no doubt benefits emotionally from his parents ability to co-parent and not engage in conflict in his presence or during phone exchanges." Bissada further reported, however, that "[m]ore recently" the parents had "trouble maintaining a cordial co-parent relationship," which caused David to be "afraid to sleep alone." Mother told Bissada that David had been sleeping in her bed, but that she was trying to stop him from doing so.

10

Russ also provided a progress letter, which stated that he had met with the parents only four times during the three-month supervisory period. Russ stated that, overall, "both parents report that they basically co-parent well, and the frequency and intensity of their conflicts are greatly reduced from when they began the treatment and even from this past spring." Like Bissada, however, Russ also reported that the parents' conflict had recently "increased." According to Russ, parents had briefly "resum[ed] their romantic relationship . . . [for] between 3 and 7 days [and then] mutually broke up." Mother was "extremely upset that they broke up" and they "both accuse[d] each other of being manipulative."

Russ's letter also stated that the parents had gotten into an argument concerning David's birthday party, which caused mother and David to become upset. Mother then sent text messages to father stating that she was going to tell DCFS about their argument; father allegedly responded by telling her that this would only escalate the problems, which would be harmful to David. When Mother told father she still intended to contact DCFS, father threatened to give pictures to Russ "proving she was continuing her involvement in prostitution." Russ reported that "father [later] admitted that he threatened mother with showing [Russ] the pictures but not because of mother's continued escalation." Father said he had "threatened to do this when mother was demanding that he give her more than $2000/month [in child support] that he currently gives her. He said that he threatened her to show that mother had income she was not reporting." Mother alleged such threats were "emotionally abusive[,] . . . violent" and demonstrated that parents were engaged in a continuing "'Cycle of Violence.'"

Russ also reported that mother had become frustrated with him during the therapy sessions because she did not believe he had adequately acknowledged father's behavior was a continuation of a "cycle of violence" or that father had previously engaged in domestic violence. Russ stated that he had informed mother that, over the last four to five months, it appeared she had done things to provoke father and that father had not responded in an angry way. Russ also clarified in the letter that "it was [his] assessment that when mother and father were together in the past there was domestic violence and

11

that the incident which brought this family to the attention of the Court was clearly part of the domestic violence in which they both participated." Russ also reported that David's principal reported that mother frequent failed to bring the child to school and often brought him in late.

Russ concluded by stating that although "the frequency and intensity" of the parent's "conflict . . . [was] significantly less than [it was during the] past spring, mother's anger [was] increasing and she [was] doing things to provoke father." Father normally would not respond, but "sometimes, as in the case of his threatening to show [Russ] pictures, he did respond." Russ reported that, overall, both parents were "more accommodating, and accuse[d] the other less than before." Father was "more accommodating . . . and less likely to complain about medium and minor issues than . . . mother." Russ also expressed "concern[] that without both of them knowing that DCFS and the Court are watching them, the disagreements and conflict are likely to increase." He recommended that DCFS retain jurisdiction for three to four more months.

Based on the information provided by Bissada, Russ and the parents' individual counselors, DCFS concluded that the parents had "exhibited positive progress overall as it pertains to their communication in that they compromise better and that they have made a concerted effort to resolve challenges that include but are not limited to agreeing to visitation schedules and David's overall general care." DCFS further concluded, however, that because some of the therapists expressed their belief that the parents' conflict had shown signs of increasing, the court should retain jurisdiction for an additional three months of supervision. The court set an additional section 364 status review hearing for May 16, 2012.

### B. Fathers' Section 388 Petition and DCFS's Section 342 Petition

#### 1. Summary of father's section 388 petition

On February 15, 2012, father filed an emergency section 388 petition seeking sole custody of David, with monitored visits for mother. The petition was accompanied by a declaration in which father stated that, during a conjoint therapy

session on February 9, 2011, mother announced David had recently made "suicidal comments" and that he had been making similar comments for "a long time." The declaration stated that, immediately after the conjoint therapy session, David met with Bissada, who then wrote the parents an email summarizing her session with the child. In the email, which was attached to the declaration, Bissada reported that David had said "he wished he had never been born and that he doesn't want to be in this world." David also stated that "if he was going to try to be out of this world he would use a knife . . . from the kitchen" and that he wanted to stay six-years-old "forever so that he never has to worry about money." Bissada recommended that the parents keep David away from sharp objects as a precautionary measure and told them not to discuss the matter with David until they were all able to meet together.

Fathers' declaration stated that, after receiving the email, he was driving in his car and permitted David to call mother. Father alleged David placed the call on speaker phone and father heard mother, who was speaking in Russian, refer to Bissada by name three times. Father believed mother was "violating what Dr. Bissada had just requested that we do" and disconnected the call. He later sent mother an email "regarding her violation of Dr. Bissada's requests to keep our son safe." The email was in all capital letters, and accused mother of having attempted to "steer" her conversation with David toward the meeting with Bissada.

Father's declaration also reported that, after receiving Bissada's email, he brought David to DCFS, which then transported the child to "Kaiser Hospital as a result of his suicidal ideation." David remained in the hospital until February 15. The declaration stated that, during the visits, David became more anxious when mother visited and that mother had not respected the staff's requests to leave at the end of visitation hours and to refrain from speaking to David in Russian.

The declaration also accused mother of a wide variety of misconduct during the past several months, which included refusing to bring David to see Bissada, refusing to bring the child to school on time and allowing the child to sleep in her bed. Father also asserted that he believed mother suffered from "serious depression" and had "talk[ed]

13

about her own suicide," which she might "intentionally or unintentionally express to David."

On February 16, 2012, the court heard father's emergency section 388 request and told the parties that it intended to schedule a full hearing because it did not have enough information to take any action. County Counsel agreed with the court's proposal, noting that DCFS did not believe mother had been neglectful and was concerned that "father's main concerns may be . . . more with custody . . . .and not paying child support than with David's safety." David's attorney also agreed that the matter should be set for a full hearing, stating that the child "seemed to do much better when he was in a foster care than he was doing with the parents." David's attorney did not object, however, to allowing the child to stay with father until the hearing, explaining: "Honestly, I can't tell who [is] worse, quite frankly, the mother or the father. I am concerned, however, that if there is any truth at all to the indications that the mother would be expressing the suicidal type of thoughts that this does put David even at even more severe risk. And, again, this would not be a permanent request . . . It would be just until we could come back to get an update from Dr. Russ, as well as Dr. Bisadda, about what happened in the interim."

The court left all of its prior orders in place, set a progress hearing for February 24, 2012 and set a hearing on the section 388 petition for March 16, 2012.

### 2. *February 24th progress report hearing and filing of the section 342 petition*

#### a. *DCFS's status reports*

Prior to the February 24th progress hearing, DCFS submitted an interim report regarding the child's hospitalization and the events that had followed. The report stated that Bissada believed David's "psychological well-being" had been "hugely compromised" as a result of his parents' relationship and that parents were "unable to focus on their child's well-being given their ongoing efforts to berate one another, while using their son as a pawn to further their respective agendas." DCFS also reported that it appeared "each parent [wa]s adamantly contending to obtain custody of their son to the

14

exclusion of the other, as a result, [Bissada] reports that the child becomes increasingly anxious and thereby continues to decompensate. Most recently, the child had been diagnosed with major depression and anxiety disorder."

DCFS also explained that, on February 21, 2012, it had facilitated a "team decision-making" meeting (TDM) with Bissada, Russ, the parents, a TDM facilitator and several social workers. The DCFS report stated that although "the parents ultimately agreed to maintain close supervision of the child, throughout the course of the 2 hour meeting they were unable to focus on his well-being given their determined efforts to berate and blame one another for past issues. Ultimately the meeting was concluded as the parents were unable to refrain from belittling one another to the extent that they ignored all attempts to direct their attention to their sons needs."

The TDM facilitator expressed the following observations after the meeting: (1) "there appears to be a lack of appropriate communication between the parents including inappropriate comments made about one another to the child"; (2) "the child appears to be under a lot of stress and is preoccupied with issues as related to their parents' ongoing conflict"; (3) the "parents continue to blame each other including ongoing comments about their past and are not able to focus on the child's mental health needs and appear clueless as to how their conflict impact their child, to the point of hospitalization"; (4) "Mother feels the service providers are siding with father given that he is the one who pays the fees"; (5) the parents "required continued redirecting during the TDM and were still unable to focus their energy on their child's needs. Conversely, they continued to blame each other throughout the meeting which was prematurely concluded as a result."

In its "assessment/evaluation," DCFS concluded that although the parents had been cooperative and were in compliance with the court-ordered case plan, they "appear[ed] to be making no movement toward resolving their highly conflictive relations, which is dangerously toxic at this point." The social worker who wrote the report, Karla Hosch, noted that she "continued to receive a daily barrage of e-mails from mother and father wherein they continue be invested in petty conflicts. [sic.] The DCFS staff and mental health professionals are exhausted and hugely frustrated by the parents'

15

longstanding and extreme conflict which has to date not been alleviated by various therapeutic modalities, including but not limited to their past participation in individual and conjoint therapy . . .”

Immediately prior to the hearing, DCFS submitted a "last minute information" accompanied by progress letters from Bissada and Russ. Bissada's letter, dated February 22, 2012, reiterated that David had expressed "suicidal ideation stating that he did not want to live in this world and could use a kitchen knife to kill himself." Bissada asserted that it was "clear that [parents'] ongoing, severe deficiency in the ability to appropriately co-parent David has contributed greatly to [David's] emotional distress culminating in a psychiatric hospitalization." Bissada reported that although she had not witnessed father acting inappropriately in the presence of child, mother had "repeatedly spoken negatively of [father] in front of David" and "shared information with [him] that [Bissada] deem[ed] inappropriate," including her financial problems and the sadness she felt when separated from David. Mother also refused to make David sleep in his own bed, had refused to bring the child to therapy and failed to bring the child to school on time.

Bissada's letter also stated that, "on several occasions, [David had] expressed his wish that his parents are [sic] friendly with one another and that they stop fighting. Unfortunately, he is instead exposed to his parents' chronic conflict as well as to information that is inappropriate and confusing. I have no doubt that his statement, 'I do not want to live in this world', and resultant suicidal ideation is in reaction to the continued war between his parents. David's ability to cope, problem solve independently and function at an age appropriate emotional and psychological level, has been detrimentally affected by his current environment. . . Regardless of treatment, he will continue to suffer emotional harm as long as [mother] refuses to follow recommendations on his behalf and as long as his parents are unable to co-parent effectively and to shield him from their conflict."

Russ's progress letter, also dated February 22, 2012, stated that the parents' conflict "continue[d] to grow." Russ believed that father had generally followed his suggestions regarding how to minimize the parents' conflict, but that mother had "not

16

been cooperative." According to Russ, mother had been late to therapy sessions, refused to discuss certain topics and was interfering with David's schooling. Russ reported that father stated he did not believe David was "physically safe while in [mother's] care" because he thought mother was "suicidal and that if she committed suicide she would likely kill David as well." Russ told father he had not seen mother engage in "any behavior that indicated that she was suicidal or presented a physical threat to David in any way."

Russ also reported that, on two occasions, he had become "extremely exasperated with [mother] and lost [his] therapeutic position." On each occasion, Russ yelled at mother because she was "making big deals out of small issues," which was exactly the type of behavior that was causing the parents' on-going conflict.

### b. February 24th progress report hearing

At the February 24th hearing, the court announced that, based on the information it had received from DCFS, its tentative ruling was to detain David from the parents. County Counsel indicated that DCFS agreed with this position, stating "given what is in the last minute and the report, the fact that both parents have ongoing, quote 'severe deficiency in the ability to appropriately co-parent David . . . culminating in a psychiatric hospitalization,' I do think it would be a wise decision to give this child an emotional reprieve from his parents." David's counsel also agreed with the recommendation.

Father's counsel believed David should be left in father's custody, arguing that a "careful reading of [Russ and Bissada's] letters suggests that [father] has done what he's supposed to do" and that the "mother continues to say inappropriate things to the child." Counsel added, however, that if "that's what the Court deems is appropriate, he wants whatever is best for his son." Although mother disagreed with father's characterization of the evidence, she also indicated that she wanted whatever the court believed was best for David.

The Court found that continuance in the parents' home would be contrary to David's well-being and ordered him removed. The court also ordered DCFS to make

17

every effort to place David in the same foster home he had been in during his initial detention, noting David had done "very, very well, in fact better than at any other time in this case, when he was in [that] foster home."

Father's counsel stated that he wanted to set the matter for "a trial without waiving time." The court thereafter ordered that the "no time-waiver adjudication date" would be March 16, the same date set for father's section 388 petition, and ordered "the Department to file a petition within 72 hours."

### 3. Section 342 petition and jurisdictional report

On February 29, 2012, DCFS filed a petition under section 342 alleging that David was a person described in section 300, subdivision (c).[2] The allegation in support of the petition alleged, in part, that parents had "emotionally abused the child in that the parents [sic] 'toxic relations' contributed to psychological decompensation of the child. . . . Such emotional abuse of the child on the part of the parents places the child at substantial risk of suffering serious emotional damage as evidenced by severe anxiety, depression, withdrawal and aggressive behavior toward himself and others." At an initial hearing on the section 342 petition, the court ordered that David was to remain detained with all prior orders to remain in effect.

On March 16, 2012, DCFS submitted a jurisdictional report stating that the agency social worker had attempted to interview David about the allegations in the section 342 petition, but that he "became anxious when questioned about his parents at which time he became evasive and fairly unresponsive." The social worker interviewed mother, who acknowledged that her "strained relationship with father has a detrimental impact on their

---

[2] Section 342 states: "In any case in which a minor has been found to be a person described by Section 300 and the petitioner alleges new facts or circumstances, other than those under which the original petition was sustained, sufficient to state that the minor is a person described in Section 300, the petitioner shall file a subsequent petition. This section does not apply if the jurisdiction of the juvenile court has been terminated prior to the new allegations. All procedures and hearings required for an original petition are applicable to a subsequent petition filed under this section."

18

son." Although mother did not believe David had "been witness to any altercations between [the parents]," she was aware that he could "sense the tension." Mother also believed she and father were "equally at fault," and noted that the parents' conjoint therapy did not "seem to be helping" their "communication problems."

Father, however, "denied allegations that his relationship with the . . . mother [was] strained" and believed that Russ had taught them how to "communicate effectively." Father stated that he distanced himself from mother to avoid any strain and had done "exactly" what he was directed to do by all of the therapists and social workers. Father also stated that the "foster father said that mother made David cry when talking with him on the phone" and denied that the parents' combative relationship had caused the child's depression, anxiety or suicidal ideations.

DCFS also interviewed the foster parents, who reported that "mother appears more nurturing and considerate than father" and that father "presents as immature in relation to how he communicates with mother." The foster parents also denied ever having told father that mother made the child cry during phone calls.

In its "assessment evaluation," DCFS concluded that although the parents had received a "year of family maintenance services," they "remained unable co-parent effectively on a regular basis," which had been a detriment to the child's "emotional/mental health status." According to DCFS, the parents still "incessantly blame[d] each other to the extent that they . . . have a difficult [time] communicating as to their son's best interest." Based on its investigation, DCFS concluded that "[w]hile mother desires a more harmonious relationship with father, father appears determined to further his mission to obtain sole custody of the child by berating mother and by discounting her parenting skills. Mother feels victimized and contends that because father has money he is able to b[u]y the allegiance of therapists, school staff, etc." Mother also "continues to report that there are problems with the father creating lies about her . . . Father has submitted numerous documentations to [DCFS], the therapist(s), and he has used derogatory language in reference to mother and seems

19

invested in presenting mother in a bad light." DCFS recommended continued placement in the foster home.

Between March 16 and May 3, 2011, the adjudication of the section 342 petition was continued several times for a variety of reasons, including illness, an intervening (and subsequently withdrawn) motion from father to remove social worker Karla Hosch from the case, court congestion and attorney vacations. Father repeatedly objected to the delays on the basis that the adjudication had not commenced within 60 days of David's detention as required under section 352, but that the court had failed to make a finding of exceptional circumstances.

### C. Adjudication

#### 1. Summary of witness testimony

The adjudication began on May 3rd and continued on numerous court days throughout May and June. Father called himself and four additional witnesses to testify: Karla Hosch (the DCFS social worker), Bissada, Russ and Meyer Greene, who worked at David's school.

#### a. Testimony of Karla Hosch

Hosch testified that, during an interview she conducted on March 7, 2012, David said the parents do not talk negatively about each other in his presence. David also denied telling his mother that he wanted to hurt himself. Hosch admitted that she failed to include this information in any of the DCFS reports that were submitted to the court.

Father's counsel asked Hosch to explain whether DCFS had concluded that David should be removed from the parents' custody during the February 21, 2012 TDM. The court, however, interjected and informed counsel that this line of questioning was not relevant. The court explained that the court, not DCFS, was the entity that had decided to detain David, and that the decision was based on information Bissada had provided in a progress letter issued the day after the TDM was held.

Father's attorney then moved for a mistrial and asked the court to recuse itself for "not letting [him] make a record . . . that there was a determination that there was no risk

to this child two weeks after the alleged incident." The attorney also argued for the first time that the court should recuse itself because it "ordered a petition to be filed on February 24th. I think there is an actual conflict here, where you are going from objective fact finder to prosecutor. And I feel my client is being denied due process." The court denied the motion for mistrial and invited the attorney to file a section 170.1 motion.[3]

When father's counsel asked Hosch to describe what conduct father had engaged in that allegedly caused David's emotional distress, she stated that it was "the conflict between the parents" detailed in Bissada's letters. Hosch later added that the "combination between the mother and father's relations" had "contributed to the consequences of the child's being placed in the hospitalization on the 5150." When asked whether she could provide any specific dates on which the parents had an altercation that caused David's emotional distress, Hosch stated that the conflict was "ongoing during the past year." Hosch acknowledged, however, that, between May of 2011 and January of 2012, the child had experienced moments of "positive progress" and reported being fairly happy and healthy in the care of the parents. Hosch also stated that, prior to the hospitalization, David had reported being happy in father's home.

Hosch further testified that she was not aware of any evidence demonstrating that parents had engaged in a physical or verbal altercation in David's presence since August of 2011. She also admitted that: (1) during David's hospitalization, she had not spoken to any doctors or seen any medical records indicating that father caused David's emotional distress; (2) she did not receive any information suggesting that father made comments about mother's depression in the presence of David; and (3) as of the February 21 TDM, DCFS did not believe that there were any "exigent circumstances" that required David's immediate removal from parental custody.

---

[3]     The motion was later filed and denied by the court. Father's attorney moved for mistrial on numerous additional occasions and filed another motion pursuant to section 170.1. All of the motions were denied.

### b. Summary of Bissada's testimony

Bissada testified that she believed father had engaged in conflict with the mother because David had "expressed to [her] that his parents fight and yell at each other all the time." Bissada could not, however, provide specific dates on which any of these altercations may have occurred, explaining that David's "reports were general in that his parents fight and yell." Bissada did not believe father had ever "emotionally abused" David, clarifying that, in her view, the term "emotional abuse" would consist of "using statements toward a child that are damaging to them, emotionally engaging in behavior that the child is exposed to that are chronically and consistently displayed in the child's presence." She further clarified that although she did not believe the parents had emotionally abused the child, she did believe the parents' "lack of co-parenting" – which she defined as the inability to maintain "clear and effective communication . . . in their treatment of their child" – was a threat to the "emotional best interests" of David and "affected his emotional well-being in a negative way."

Bissada testified that children "of [David's] age, six-years old, often have trouble being able to express themselves through words, and so, through play, they will project their own feelings and thoughts in their play." Bissada described a picture David drew in March of 2012, which showed a fish between two homes, and a story he had dictated to her about the fish, which she had written down: "Fish trying to decide who to live with. He wants to live with his mom. His mom will not like it if she knows the kid fish loves the Dad. The Dad will not like it if he knows that the kid fish loves the Mom. They both don't want the kid fish to live at the other house. They don't want to share the kid fish. The judge says he can live with the mom but he is still thinking about how many days a month with the dad." Bissada stated that, in her professional opinion, David's stories projected his feelings about his parents and their relationship.

Bissada testified that, contrary to the therapists' recommendations, mother had been engaging in the following detrimental conduct: speaking about father and financial issues in front of David, permitting the child to sleep in her bed, bringing David to school

22

late and being at the school during teaching hours.  Bissada had no information indicating father engaged in any such conduct.

Father's counsel asked Bissada to explain what specific conduct father had engaged in that caused her to state in a progress letter that the parents were engaged in a "war."  Bissada explained that her opinions were "[b]ased on what the child expressed to me about his parents' interactions with one another, as well as what he expressed through his stories and drawings in our sessions."  The only specific instances of actual parental conflict she could recall occurred in 2010 and May of 2011.  Bissada also admitted she had never seen father yelling in front of David.

Father's counsel also asked Bissada to discuss the conversation during which David said he did not want to be part of this world.  Bissada explained that David said he no longer wanted to be in the world and wanted to live inside the mouth of a dead octopus.  When Bissada asked David how he would not be part of this world, David said: "'I would kill myself" with "a knife from the kitchen," adding that he wished he was never born.

Bissada also explained how the child's behavior had changed since she began her treatment in early 2011.  According to Bissada, from March 2011- October 2011, David would tell stories "of families, parents put in jail, police killing the parents, killing babies, the little boy trying to get the parents out of jail about the world coming to an end."  Then, he went through a transition in late 2011 where he actually "played out stories" using toys:  "the bad guys would fight the good guys, and the good guys would become bad guys, and the bad guys would become good guys again.  And he would just continue this conflict back and forth, back and forth, them sucking their power from each other and turning good, turning bad."  In the last six weeks – during which time David had been detained from the parents – he had "wanted to do art" or write books about animals.  In more recent sessions, David had decorated a book named "David the artist" and made bracelets with his foster siblings' names on them.

Bissada also reported that, since his placement in the foster home, David's "mood [wa]s much less agitated" and that he had become more positive about school and his

therapy sessions, which he no longer tried to control. He had also stopped asking questions about who was paying for Bissada's time, disparities between his parents' income and whether he could talk to the social worker and judge about "where he wants to live." In Bissada's view, David's more recent conduct demonstrated that he was not "as preoccupied with conflict."

Bissada also testified that she attended several of the parents' conjoint therapy sessions and "observed [parents] having strained relations with one another." Bissada reported that when she would present information that David had shared, the parents would typically "deny having spoken to him about the topic," rather than communicating with each other about the issue. She further reported that "there was a lot of time spent with the parents speaking about their dissatisfaction with the other parent's parenting and that took the majority of the session."

Bissada concluded that, overall, two factors contributed to the child's "emotional distress": "the mother's failure to follow [Bissada's] recommendations and the parents' conflict and inability to resolve that." More specifically, she believed that "David's perception of his parents' relationship, based on his witnessing their interactions with one another, contributed to his emotional difficulty." She also believed his emotional health had improved since being placed in the foster home.

### c. Testimony of Ian Russ

Father also called Ian Russ, who testified that mother frequently showed up late to the conjoint counseling sessions. Russ also described numerous instances in which mother had engaged in conduct that increased the amount of conflict between the parents, including: breaking into father's house, calling the police to report that father was not giving David enough food; bringing David to school late; entering the school when parents were not supposed to be there; and feeding David with a spoon. Mother also frequently brought up the issue of money, asserting that father should pay her more than $2,000 a month to support the child and not deduct expenses from those payments or demand receipts for the items she had purchased. Mother also repeatedly complained

24

that she believed David missed her and was sad when in the care of father. Mother also stopped scheduling conjoint therapy sessions in December of 2011 because she believed Russ was biased against her and that Russ participated in a "cycle of [domestic] violence" being perpetrated against her by father.

Russ reported that he had also worked with father on a variety of provocative behaviors, such as "reducing . . . the amount of rhetoric . . . in emails" and "not talk[ing] about the other person's parenting, to not make any accusations." Father also complained about the number and duration of phone calls that DCFS required David to have with mother. According to Russ, father brought up the issue of the phone calls repeatedly, stating that they only agitated the child and "aren't doing anything." Russ also stated that that "the way [father] would take money away from mother" was "inappropriate and manipulative" and that "father had issues with being manipulative and controlling."

Russ also testified that father stated that he had hired an investigator to follow mother and obtain proof that she was engaged in prostitution. Father also admitted he had told the head of David's school that mother was a prostitute. According to Russ, in or around December of 2011 or January of 2012, father stated that he had tried to obtain evidence of her prostitution to show that she had financial resources of her own, and therefore did not need more than the $2,000 a month he provided to her.

Russ acknowledged there were "times in the relationship between mother and father when father has exacerbated the conflict." He also concluded that, prior to coming to therapy, there were elements of mutual domestic violence in the parents' relationship, but did not believe that it was "ongoing." Russ believed, however, that father had become less reactive to mother's behavior and had grown increasingly "bewildered" as to what else he could do to appease her. Russ encouraged father to be even more sensitive to money issues and the phone calls, and believed father had followed his recommendations. Russ also believed there was not "very much more [father] could do" to reduce the conflict with mother. Even after David made his statements about not wanting to be in this world, Russ was never concerned about leaving him in father's care

25

because he was "basically a good dad, basically attentive to David's needs . . . and takes pretty good care of him."

Russ also related instances in his conjoint sessions during which the parents would "digress and get into arguments about . . . very small details." On one occasion, parents got into a disagreement about the particular date on which David had attended a birthday party; on another occasion they got into an argument about what chairs they were supposed to sit in during the therapy session. The parents also briefly resumed their relationship during the course of Russ's treatment, which Russ believed to be a "continuation of a pattern they had . . . prior to beginning therapy" of "getting close and then getting angry and separating, and then getting close and getting angry and separating."

Russ stated that, in his clinical assessment, "David was aware of [the parent's] anger and conflict, even if they didn't do it directly in front of him."

### d. Father's testimony

During his testimony, father was asked to describe the conduct that had caused the conflict between himself and mother between November of 2011 and November of 2012. Father listed several issues related to mother's conduct at David's school, mother's failure to bring David to therapy or attend conjoint therapy and mother's sleeping arrangement with the child. Father further stated that, despite this conduct, he had remained "very supportive of [the mother and David's] relationship"

Father did not list any behavior that he had personally engaged in that heightened the conflict. He asserted that, during the relevant time frame, he had never engaged in "any type of activity in front of David" that "caused him anxiety"; never yelled or raised his voice in front of David; never discussed financial issues or talked negatively about mother in David's presence; and never seen the child "emotionally distraught." Father also believed that he was not deficient in his co-parenting abilities, had complied with all of Bissada and Russ's recommendations and had not "played any role in causing David to have suicidal ideations."

26

According to father, Bissada had told him during the TDM that mother was responsible for generating the conflict within David. He also testified that portions of DCFS's reports were "not accurate." Specifically, father noted that the DCFS reports did not include any information about statements in Kaiser's medical records purportedly "showing conflict [that mother] created" during David's hospitalization. Although father had given these records to the DCFS social worker, there was no mention of them in the jurisdictional report. Father also reported that he had contacted numerous DCFS employees through letters, emails and phone calls about complaints he had with the way the social worker was handling the case.

### e. Testimony of Meyer Greene

Father also called Mayer Greene, the Judaic Director at David's school, who testified that he had never seen father make any inappropriate comments in front of David or seen David distressed in his father's presence. Greene further testified that father always brought David to school on time and acted appropriately at the school; mother, however, frequently brought the child to school late and was the subject of numerous teacher complaints. Greene also stated that, while discussing what might be causing mother to bring David to school later, father had told him mother was a prostitute.

### 2. Closing statements regarding section 342 petition

At closing argument, DCFS and the David's attorney requested that the court sustain the allegations in the petition, noting that Russ, Bissada and the social workers had all reported that the parents appeared more concerned with their own personal issues than with David's well-being. DCFS and David's attorney also emphasized that, despite this evidence, father had taken no responsibility for David's feelings.

Father's attorney however, asserted that the petition should be dismissed both for procedural reasons and on the merits. First, father contended that the "social worker . . . ha[d] been unobjective" by "misrepresent[ing] and "distort[ing]" facts to the court. Father's attorney also contended that the juvenile court had violated father's due process rights by personally "ordering [DCFS to file] the [section 342] petition." On the merits,

father's counsel argued that: (1) Bissada had repeatedly stated she did not believe father had emotionally abused the child, (2) the evidence showed mother's conduct had created the parental conflict; and (3) DCFS was attempting to assign mother's misconduct to father. Counsel also noted that neither Bissada nor Russ were able to describe a single, recent instance in which father had played any role in heightening the parents' conflict.

### 3. Juvenile court's ruling sustaining the petition

At the conclusion of the adjudication hearing, the juvenile court summarized the primary issue it had to decide: "This case, when boiled down to what's actually relevant, is relatively simple. I have a six year old that was psychiatrically hospitalized with suicidal ideation. And the question, for me, why that happened." The court explained that it had found the testimony of the therapists – especially Bissada's testimony – to be the most relevant evidence. The court explained that Bissada had: (1) related specific and general statements from David indicating that the "parents fight with each other all the time"; (2) observed a conjoint session in which "there was a lot of time spent with the parents speaking about their dissatisfaction with the other's parenting"; and (3) made "very clear" that the parents felt "animosity" toward one another and that "David feels it." Russ, on the other hand, had described several instances in which the parents had engaged in significant disputes over issues that had no relation to the child or his well-being. According to the court, the parental animosity described by the therapists was "evident throughout the testimony."

The court also found it instructive that "no one indicated . . . David just has pathological mental health issues and that's what caused his psychiatric hospitalization." The court further noted that Bissada had testified that "after being out of his parents' care and custody for a few months, the child is doing quite well." "On the other hand, father's telling people that the mother's a prostitute, taking money out of her child support, telling people that the mother's going to kill David. They both can't even figure out who's going to sit in what chair during a meeting." Although the court acknowledged there was extensive evidence that mother's conduct had heightened the conflict, it found that, given

28

Bissada's statements about the cause of the child's emotional distress, "father's testimony on the witness stand . . . that he had done nothing with David to cause him anxiety and that he has no blame in any of the conflict . . . is really the most telling thing here."

The court explained that although DCFS "pled emotional abuse," it was "not going to be sustaining that" portion of the petition. Nevertheless, the court believed this was "a clear subdivision (c) case": "I think that the child is suffering serious emotional harm, as evidenced by this hospitalization, as a result of the conduct of the parents together. There is no indication here that either parent has looked at David and said emotionally abusive things. But at least from the evidence I have, there is also no indication that they understand that their relationship and what they've exposed this child to, over and over and over again . . . has created the situation that we're now in, where he would rather die than continue to live with his parents."

The court modified the subdivision (c) allegation to state the following: "On an ongoing basis, the child['s mother and father] exposed the child to the parents' toxic relations and extreme conflict, which contributed to the psychological decompensation of the child. The parents lack appropriate communication and blame each other. The parents expose the child to the parents' chronic combative relationship, resulting in the child experiencing depression, anxiety, suicidal ideation, and the child's hospitalization in a psychiatric facility on February 10, 2012." The court found the allegation to be true by a preponderance of the evidence, and set the matter for a disposition hearing on June 25, 2012.

### D. Disposition Hearing

#### 1. Summary of witness testimony

Two witnesses testified at the disposition hearing: father's personal therapist and mother.

*a. Testimony of Natalie Cohen*

The father's therapist, Natalie Cohen, testified that she had been providing weekly therapy to father for approximately five years. For the past eight months they had been focused on improving his parenting skills and reducing the conflict with mother.

Cohen testified that, during the "early stage[s]," father had reported that the relationship with mother was "very dramatic." Although it "wasn't always clear who was instigating what," it was "obvious" to Cohen that the parents' behavior had to be "disruptive to both of them" and "distracting from the care of the child." Cohen believed that, more recently, father had made "great efforts to stabilize the type of relationship they have." She also noted, however, that the parents had a brief "interlude" in September or November of 2011 "where it became romantic again," which had previously proven to be "very chaotic."

Cohen reported that father and mother had had recent conflicts over whether father should be deducting Bissada's payments from mother's monthly support and "a lot of conflict about the child's sweatshirts." More specifically, the parents had disagreements about who had lost the child's sweatshirts. Cohen advised father to purchase several cheap sweatshirts that could be easily replaced without placing blame on either parent.

Cohen and father also conferred about "softer, gentler ways to present one's idea[s]." During the previous week, they had discussed the manner in which father expressed himself, which frequently sounded "more terse or more curt or . . . critical" than he intended." Father did not realize how he sounded and Cohen had spent "quite a deal of time" on the issue because "[father] was not improving as rapidly as we had hoped." Cohen had also discussed with father ways in which his manner of expressing himself may have impacted his conflict with mother.

According to Cohen, father's present therapy focused on "working on a peaceful and friendly, business-like parenting relationship that has the priority of David's best interests first." Cohen believed father had been very open and willing to submit to the therapist's advice. Cohen stated he "absolutely" believed that "both" parents had

participated in "some pattern or cycles of domestic violence" in the past, which Cohen had discussed with father.

On cross-examination, Cohen was asked whether she was aware father had stated that "he believed the responsibility for David's internal conflicts that led to suicidal ideations lay solely with the mother and not at all with him." In response, Cohen stated: "I'm not aware of that being what he said. That's not what he said to me."

Overall, Cohen believed father had improved his behavior greatly, was making better choices and become more adept at shielding the child from the "ups and downs of his relationship." Cohen also believed father had remained more "business-like" with the mother, with the "focus primarily on David and not so much on themselves."

Cohen questioned whether David was in fact suicidal and whether the conflict between the parents had caused his suicidal ideations. Although Cohen acknowledged she had not treated the child, she thought it "seemed possible" that the comments may have been caused by a video the child had watched involving a "very violent incident about an orange and knife." According to Cohen, "[t]here are a lot of outside factors that I'm not hearing discussed in the court . . . like this video."

### b. *Testimony of mother*

Mother testified that she had "made a lot of mistakes" and that some of her conduct – including talking about financial issues in front of David and her behavior at David's school – contributed to the child's emotional distress. She also acknowledged that her conduct toward the school was part of a "passive aggressive" behavior she engaged in as a result of her discomfort with the school. Mother testified that she had not realized "how much David feels and understands" and now recognized that, "without intention . . . [she] caused the damage . . . . [and] contributed to [David's] suicidal ideation . . . by not protecting him from hearing things, watching [her] facial expressions, overhearing things, by not considering dynamics in school."

Mother also testified that, throughout their relationship, father had tried to control her by threatening to take David away and threatening to throw her out of the house if she

did not behave in a certain way. She also alleged father had engaged in "financial control, manipulation, mind games . . . physical violence, as pulling my hair and kicking, pushing." Mother said she had since "terminated" the domestic violence in the relationship, and stated that no physical acts had occurred in the last 10 to 12 months. Mother stated that she had been working hard to be "a better person" and a "better parent," and not to react when she was called a prostitute or other negative names because she knew it was not true.

### 2. *Closing argument*

At the closing argument, David's attorney requested that the child remain with the foster parents, with the possibility of unmonitored visitation. The attorney asserted that Cohen's testimony demonstrated that father had been addressing the same issues for years and was still unable to acknowledge any role in causing David's distress.

Father's counsel, however, argued that David should be returned to father's custody, contending that there were "no statements from any of the therapists involved that [father] was being derogatory or playing out any of the conflict by acting in a way that was undermining or negative toward the mother in front of David." Father's counsel also argued that he had completed all of the services the court had ordered and voluntarily followed all of the therapist's recommendations.

### 3. *Trial court's disposition order*

Prior to issuing its ruling on disposition, the court noted that it had been presiding over the matter for 18 months. Initially, the court believed it "could at least get the parents to work together and to agree on a custody arrangement" and that "it would be the best thing for David to be in the custody of his parents." The court acknowledged, however, that its initial assessment had "[c]learly [been] wrong."

The court concluded that DCFS's reports showed that while things had "vacillated between a little better and a little worse [for David]" during the first year of court supervision, his hospitalization showed that things had deteriorated. The court found it particularly troubling that David not only expressed suicidal thoughts, but had a specific

plan on how he would carry out his suicide. The court noted that "David's not wanting to live with the world" was not because his parents did not love him or because he was "specifically being abused by either one, but simply that their relationship was so bad and so detrimental to him that he didn't want to live here with that kind of thing going on around him."

As in its jurisdictional ruling, the court emphasized that the most important evidence was Bissada's statements about "her interactions with David" and Russ's statements about his "interactions with the parents," which indicated that "both mother and father exacerbated the conflict at different points in time." The court also noted that the father's behavior during trial indicated that he had still not addressed some of his underlying behavior. The court described an instance during the adjudication proceedings when it heard father tell Bissada that mother would have to pay for the therapist's time if she wanted to conduct a cross-examination. Bissada later told the court that father said he would not pay her after she completed her testimony. The court felt this conduct demonstrated that "financial issues are still at the forefront." The court also noted that father's counsel had objected repeatedly while Bissada was attempting to testify as to how David was feeling, suggesting that father was still not interested in hearing how his conduct was impacting his child.

The court also noted that it appeared "there was more interest in winning than listening or trying to figure out what to do for David. There was a lot of deflecting blame." In the court's view, the evidence also showed that minor issues between the parents continued to escalate into serious disputes, which was not in David's interests. "While there's indication, at least through argument, that none of this happened in front of David, I think it is truly naïve of either parent to not realize that all of this happens in front of David, that he is affected by it." The court also emphasized that father still refused to take any blame in the matter: "The only person I didn't see taking any blame in this matter for what's going on with David or what he feels was the father, based on his own testimony."

In summarizing his ruling, the court explained: "[T]he focus for me was not on father's individual relationship with David and not on mother's individual relationship with David, but on the relationship between the parents that so clearly adversely affected David. [¶] . . . [¶] This is really about a child who, when he was with his parents and in their care and custody, was blowing everything up. Everything was at war, hurting each other. . . . And since he's been out of the parents' custody, he's wanting to make friendship bracelets. . . . That says a lot about this case [¶] . . . [¶] What I know from David being in this foster home twice now is this. When David is out of the care of his parents, in a neutral setting, with monitored visits, he does much better. He did much better the first time around. He's doing much better this time around. And the court is leaving that situation in effect."

The court found, by clear and convincing evidence, that returning David to the parents' custody would be a substantial risk to his well-being and that there were no reasonable means to protect him without removing him from the parents.

Father appealed the jurisdictional and dispositional orders.

## DISCUSSION

Father raises three arguments on appeal: (1) the juvenile court's jurisdictional and disposition orders were not supported by substantial evidence; (2) the juvenile court acted in excess of its statutory authority and violated the separation of powers doctrine by ordering DCFS to file a section 342 petition; and (3) the juvenile trial court granted several continuances that resulted in a violation of the time limitations set forth in section 352, subdivision (b).

### A. *The Trial Court's Jurisdictional and Disposition Orders Were Supported By Substantial Evidence*

#### 1. *Standard of review*

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted

or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] '"[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate].'" [Citation.]" [Citation.]'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.) If the appellant's challenge to the juvenile court's jurisdictional finding or disposition is predicated on an issue of law, we review the issue de novo. (*In re David H.* (2008) 165 Cal.App.4th 1626, 1633.)

2. *The trial court did not err in ruling that David was a person described in section 300, subdivision (c)*

Although the juvenile court struck language in the section 342 petition alleging that the parents had emotionally abused David, it ruled that jurisdiction was nonetheless proper under section, 300, subdivision (c) based on its finding that the parents had exposed the child to their "toxic" and "chronic combative relationship," which "result[ed] in the child experiencing Depression, Anxiety, suicidal ideation and the child's hospitalization in a psychiatric facility." Father raises two points of error regarding this jurisdictional finding. First, he asserts that, as a matter of law, a child cannot be declared a dependent under subdivision (c) unless there is evidence that the parent has committed physical, sexual or emotional abuse against the child. Alternatively, he alleges that the record contains insufficient evidence to support the juvenile court's finding that he personally engaged in any conduct that caused David's emotional distress.

35

*a. Section 300, subdivision (c) does not require a finding of parental emotional abuse*

Father contends that the conduct alleged against the parents in the amended section 342 petition – exposing David to their combative relationship and being unable to co-parent their child – is not sufficient to sustain a finding of jurisdiction under subdivision (c). According to father, subdivision (c) applies only if the evidence shows that the parent perpetrated physical, sexual or emotional abuse against the child. He further contends that because the juvenile court struck language from the original section 342 petition alleging that the parents' emotionally abused David, there was no basis for sustaining jurisdiction under section 300, subdivision (c).

Father's assertion that subdivision (c) requires a showing that the parent actually abused the child conflicts with the language of the statute. Subdivision (c) states, in relevant part, that a child may be found to be a dependent of the court if "[t]he child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, . . . as a result of the conduct of the parent or guardian. . ." The subdivision does not include any language that limits its application to instances in which the parent has actually abused the child; rather, it states that jurisdiction is proper if a parent has engaged in "conduct" that has caused the child to suffer various enumerated forms of emotional damage or places the child at substantial risk of those forms of emotional damage. The plain language of the statute therefore indicates that subdivision (c) may extend to the sort of improper parental treatment or conduct evidenced here that causes or places the child at substantial risk of emotional damage.

Father, however, argues that in *In re Alexander K.* (1993) 14 Cal.App.4th 549 (*Alexander*), the court held that, as used in subdivision (c), the term "conduct" is intended to mean physical, sexual or emotional abuse. The appellant in *Alexander* argued that subdivision (c) was "so vague as to violate a parent's due process rights because it fails to give fair notice of what conduct to avoid." (*Id*. at p. 558.) The court rejected the

36

argument, explaining that although the wording of subdivision was "vague as to the parental conduct that would be at fault," subdivision (j) of section 300 contained additional language stating: "'It is the intent of the Legislature in enacting this section to provide maximum protection for children who are currently being physically, sexually, or *emotionally abused*, being *neglected*, or being *exploited*, and to protect children who are at risk of that harm . . .' (Welf. & Inst. Code, § 300, subd. (j), italics added.)" (*Id*. at p. 559.) The court concluded that, based on this additional language, it was "clear . . . that the parental conduct branch of subdivision (c) seeks to protect against abusive behavior that results in severe emotional damage. We are not talking about run-of-the- mill flaws in our parenting styles – we are talking about abusive, neglectful and/or exploitive conduct toward a child which causes any of the serious symptoms identified in the statute. . . . Viewed in light of the entire statute, subdivision (c) is not overly vague. Persons of common intelligence would not have to guess whether someone was maltreating their child to the point of causing severe emotional harm." (*Alexander, supra,* 14 Cal.App.4th at p. 560.)

We do not agree with father's assertion that *Alexander* limits subdivision (c) to cases in which the evidence shows a parent has engaged in "abuse." Although the court stated that subdivision (c) was intended to "protect against abusive behavior that results in severe emotional damage" (*Alexander, supra,* 14 Cal.App.4th at p. 560), other parts of the opinion made clear that the court believed the subdivision extended to "abusive, neglectful and/or exploitive conduct," or instances in which the parent was "maltreating their child to the point of causing severe emotional harm." (*Alexander, supra,* 14 Cal.App.4th at pp. 559-560.)

The conduct alleged in the section 342 petition sustained against the parents consisted of exposing the child to a "toxic," "chronic combative relationship" and "extreme conflict." As discussed in more detail below, substantial evidence at the adjudication showed that the parents placed David at the center of a severe, ongoing conflict that had not abated despite a full year of court supervision and maintenance services. Indeed, the evidence suggests that the parents' conflict and resulting inability to

co-parent continued to increase during the supervisory period, ultimately culminating in the child's psychiatric hospitalization. Such conduct constitutes a form of neglect, exploitation or maltreatment, and cannot be construed as a mere "run-of-the- mill flaw[] in . . . parenting style[]." (*Alexander, supra,* 14 Cal.App.4th at p. 560.)

### b. *Substantial evidence demonstrates that father's conduct contributed to David's emotional damage*

Father does not dispute that the evidence at trial showed David exhibited the forms of severe emotional damage enumerated in subdivision (c) – namely "severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others." (§ 300, subd. (c).) Father contends, however that there is insufficient evidence to show that he personally engaged in any conduct that caused the child's emotional damage. We disagree.

First, there is substantial evidence in the record demonstrating that David's emotional damage was caused by the parents' severe, ongoing conflict and their continuing inability to co-parent their child. After David was hospitalized for suicidal ideation in February of 2012, David's therapist, Angela Bissada, issued a progress letter plainly letter stating: "I have no doubt that [David's] statement, 'I do not want to live in this world', and resultant suicidal ideation is in reaction to the continued war between his parents. . . . [H]e will continue to suffer emotional harm as long as . . . his parents are unable to co-parent effectively and to shield him from their conflict." Bissada also stated that it was "clear that [parents'] ongoing, severe deficiency in the ability to appropriately co-parent David has contributed greatly to [David's] emotional distress culminating in a psychiatric hospitalization."

Russ's progress letter, dated February 22, 2012, similarly indicated that the parents' conflict "continue[d] to grow." During an interview in March of 2012, mother told DCFS that the parents' conjoint therapy did not "seem to be helping" their "communication problems," and that David could "sense the tension." Finally, in its jurisdictional report, DCFS concluded that although the parents had "one year of family

38

maintenance services," they "remained unable co-parent effectively on a regular basis," which had been a detriment to the child's "emotional/mental health status."

At the adjudication, Bissada provided extensive testimony confirming her belief that David's condition was a result of his parents' ongoing conflict. According to Bissada, David had "expressed to [her] that his parents fight and yell at each other all the time." Bissada explained that such conduct threatened David's "emotional best interests" and "affected his emotional well-being in a negative way." Bissada also explained that the effects of the parents' conflict on David were particularly evident in his pictures and stories. When David was in the parents' custody, he presented stories about a child being torn between his parents, a little boy trying to get the parents out of jail and about the world coming to an end. He also related the story of a fish, who was worried that each parent would be angry if they knew he loved the other parent. Bissada testified that these stories showed "David's perception of his parents' relationship, based on his witnessing their interactions with one another, contributed to his emotional difficulty."

As the trial court additionally observed, no party presented any evidence that David's emotional distress was caused by "pathological mental health issues." Moreover, when David was removed from his parents' custody and placed in a foster home, his condition improved. After several spending several weeks in the foster home, David appeared much less preoccupied with conflict. Rather than telling stories about a child who was torn between his parents, David chose to engage in art projects. He also appeared more positive, less agitated and less preoccupied with conflict. Bissada's opinions about the cause of David's suicidal ideation, the lack of any evidence that his emotional damage was the result of any underlying pathological condition and his apparent improvement while placed in the foster home constitute substantial evidence that the parents' conflict contributed to his condition.

The record also contains substantial evidence that mother and father both engaged in conduct that contributed to their conflict and their inability to co-parent. Russ testified that, during the conjoint therapy sessions, the parents frequently digressed into arguments about "very small details," including, for example, the date on which David had attended

a birthday party and the proper seat each parent was supposed to sit in during the therapy session. Bissada expressed similar views, explaining that the parents spent a majority of the conjoint therapy sessions she had observed expressing "dissatisfaction with the other parent's parenting," rather than "focusing on David's well being." DCFS reported that, during the February 21, 2012 TDM – which was held immediately after David's release from the hospital – the parents were still "unable to focus on [David's] well-being given their determined efforts to berate and blame one another for past issues" and "were unable to refrain from belittling one another to the extent that they ignored all attempts to direct their attention to their sons needs." DCFS further reported that it "continued to receive a daily barrage of e-mails" from both parents "wherein they continue to be invested in petty conflicts," noting that "the parents' longstanding and extreme conflict . . . [had] not been alleviated by various therapeutic modalities. . ."

In his testimony, Russ specifically acknowledged that there were "times in the relationship . . . when father has exacerbated the conflict." Russ explained that, in December of 2011 or January of 2012 – which was shortly before David was hospitalized – the father admitted he had threatened mother by telling her that he was going to obtain pictures of her engaging in prostitution to prove that she had her own financial reasons. The Rabbi at David's school admitted that father had told him that mother might be bringing David to school late in the mornings because she was employed as a prostitute. Russ also reported that he had worked with father to address a variety of behavior that exacerbated the conflict, including "the amount of rhetoric . . . in emails"; "talk[ing] about the other person's parenting"; "mak[ing] accusations"; and making deductions from mother's monthly child support payments, which Russ described as "inappropriate and manipulative." Overall, Russ reported that father "had issues with being manipulative and controlling."

In its jurisdictional report, DCFS made similar observations, explaining that father had "used derogatory language in reference to mother and seems invested in presenting mother in a bad light." Finally, David's foster parents reported that father "presents as immature in relation to how he communicates with mother."

40

In sum, the record contains substantial evidence that: (1) David's emotional distress was caused by his exposure to the parents' ongoing, combative relationship and their chronic inability to co-parent effectively; and (2) father engaged in conduct that heightened these conflicts. This evidence was sufficient to sustain a finding that David fell within the jurisdiction of the juvenile court pursuant to section 300, subdivision (c).[4]

### 3. *Substantial evidence supports the trial court's disposition order*

Father argues that there is insufficient evidence to support the juvenile court's finding that returning David to his custody would place the child at a substantial risk of harm. To remove a child from parental custody, the juvenile court must find clear and convincing evidence that there is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child if he or she were returned home, and there are no reasonable means by which the child's physical health can be protected without removal. (§ 361, subd. (c)(1).) "'A removal order is proper if based on proof of a parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child."

---

[4]    Father also contends that we must reverse the juvenile court's jurisdictional finding because it was partially predicated on improper evidence, including off-the-record statements that Bissada made at the adjudication hearing and objections that father's counsel made during Bissada's testimony. In support, father cites comments the court made when entering its disposition ruling. Specifically, the court referred to a statement Bissada made after completing her testimony in which she alleged father had told her he would not pay her hourly fee for the portion of her testimony elicited during mother's cross-examination. The court also referred to the fact that father's attorney had objected repeatedly while Bissada was testifying about David's thoughts and feelings. We need not consider this argument because the court did not make these statements when ruling on jurisdiction; it made the statements during its dispositional ruling. There is no suggestion in the record that the court's jurisdictional ruling was in any way based on Bissada's statements regarding father's refusal to pay for her cross-examination testimony time or father's repeated objections to Bissada's testimony regarding David's emotions.

41

[Citation.] The court may consider a parent's past conduct as well as present circumstances.' [Citation.]" (*In re A.S.* (2011) 202 Cal.App.4th 237, 247.)

As explained above, there is substantial evidence that the parents' conflict resulted in emotional harm to David. There is also substantial evidence that both mother and father were responsible for engaging in behavior that caused the conflict. The DCFS reports and the witnesses' testimony demonstrate that, even after David exhibited suicidal ideations, the parents were unable to focus on the best interests of the child because they were consumed with their own conflict.

There is also substantial evidence that leaving David in the care of father would present a substantial risk to David's emotional well-being. Unlike mother, who at least acknowledged that her behavior had contributed to David's emotional distress, father flatly denied that he had engaged in any conduct that contributed to his child's suicidal ideation and blamed the parental conflict entirely on mother's behavior. Although DCFS observed the parents "berate" and "belittl[e]" one another throughout a meeting in February of 2012, DCFS reported in March that father denied "his relationship with the child's mother [was] strained."

The record indicates that father has engaged in a similar pattern of denial since the initiation of these dependency proceedings. When father was first questioned about the incident involving mother's truck, which was the subject of the original section 300 petition sustained in February of 2011, he denied any wrongdoing. Father alleged that he had not swerved the vehicle, had not driven fast, and had stopped as soon as he realized that M.B. was in the open bed of the truck. He also alleged that David was wearing his seat belt. These statements were directly contradicted by M.B. and V.F., who stated that father drove the vehicle in an erratic manner while M.B. was screaming and slamming on the rear window and that David was not wearing a seat belt. In addition, a neighbor reported that she heard the wheels of the truck screeching during the incident. Father, however, discounted the witness's statements.

The DCFS reports also indicate that father has consistently denied that the parents have ever engaged in any form of domestic violence. Mother, Russ and father's own

therapist, Natalie Cohen, however, all stated that both parents had participated in domestic violence at various times in the relationship.

Father's current denial that his conduct played any role in David's suicidal ideation, especially when considered in conjunction with father's past denials of other inappropriate conduct, suggest that he either does not appreciate the effect his behavior has on his child or is incapable of taking the steps necessary to curtail that behavior.

There is also substantial evidence that, even after David exhibited suicidal ideation, the parents' were still unable to set aside their conflict and focus on their child's best interests. DCFS reported that it was forced to "prematurely conclude[]" a TDM on February 21, 2012 because the parents were extremely hostile toward one another and "still unable to focus their energy on their child's needs." DCFS further reported that, after David's hospitalization, its social workers continued to receive daily emails demonstrating that the parents "continue to be invested in petty conflicts." This conduct – which occurred after David's hospitalization – supports the court's finding that, if left in the parents' custody, David would be placed at substantial risk of being exposed to the very conflict that had previously caused him emotional damage.

Finally, as summarized above in relation to the jurisdictional order, there is substantial evidence that David's emotional condition improved greatly when he was taken out of the care of the parents. This factor, considered in conjunction with evidence that father continues to minimize his role in causing David's emotional distress and that the parents have been unable to set aside their conflict despite a full year of court supervision and David's hospitalization, are sufficient to support the trial court's finding that the child would be at substantial risk of harm if left in either of the parents' care.

Father also contends that there were various reasonable alternatives to "out-of-home placement" that the court should have "considered and/or ordered." Each of father's proposed alternatives involve either leaving David in the care of the parents under increased supervision, or providing father sole custody of the child. Father overlooks the fact that, after the initial section 300 petition was sustained against the parents in February of 2011, the court permitted the parents to retain custody of David.

43

The parents, however, continued to expose David to their conflict, which eventually led to the filing of the section 342 petition. Given the parents' inability to properly care for their child during the year of court supervision, leaving David in their custody was not a reasonable alternative. Providing the father sole custody of David was also not a reasonable alternative given father's inability to acknowledge or understand that his conduct contributed to the child's emotional distress.

### B. *The trial court did not act in excess of its statutory authority or violate the separation of powers doctrine*

Father contends that the juvenile court improperly usurped DCFS's authority to initiate a dependency petition when it ordered the agency to file a section 342 petition at the February 24th hearing. Father argues that the court's order exceeded its statutory authority and violated the separation of powers doctrine. The transcript indicates that all parties understood that DCFS would file a petition in light of the new facts. Even if the court had erred, father has not demonstrated any prejudice and has forfeited any claim of error.

### 1. *Factual summary*

The court first learned of David's suicidal ideation pursuant to father's section 388 petition, which was filed as an emergency walk-on request the day David was released from the hospital. At the hearing on February 16th, David's attorney informed the court that the parties had scheduled a TDM and therapy sessions with Russ and Bissada to discuss David's statements. The court concluded that it did not have sufficient information to address the emergency motion, set father's section 388 petition for a full hearing on March 16 and ordered the parties to return on February 24th for a "progress report on how David's doing and the results of the therapy sessions . . . as well as the [TDM]."

Shortly before the February 24th hearing, DCFS provided a report summarizing what had transpired at the TDM and a last minute information containing progress letters from both therapists. In her letter, Bissada stated that she had "no doubt" that David's

44

suicidal ideation was "in reaction to the continued war between his parents" and that it was "clear" the parents' "ongoing, severe deficiency in the ability to appropriately co-parent David" had "contributed greatly to [the child's] emotional distress culminating in a psychiatric hospitalization."

At the hearing, the court informed the parties that its tentative ruling was to detain David. County Counsel and David's attorney agreed with this course of action. The mother and father questioned Bissada's factual findings, but agreed to go along with whatever the court believed was best for their child.

The court ordered the child to be removed from parents, explaining "[w]hat has happened to this little boy, based on his parents', as his therapist put it, ability to appropriately co-parent him, has resulted in him being psychiatrically hospitalized." Father's counsel immediately requested that the matter be set for trial "without waiving time." The court then set the matter for a "no-time waiver adjudication date" on March 16th, which was the same date that had been scheduled for the section 388 petition. The court ordered the social worker to provide a report by March 14th and stated "[t]he Department is to file a petition within 72 hours." No party objected to this order. Several days later, DCFS filed its section 342 petition asserting that David was a person described under section 300, subdivision (c).

On February 29, March 16, April 16, April 30, and May 2, the court held preliminary hearings regarding the pending adjudication; no party raised any issue regarding the court's prior instruction that DCFS was to file the section 342 petition within 72 hours. During the adjudication, the father's counsel argued for the first time that the court should recuse itself based on the fact that it had ordered DCFS to file the section 342 petition, stating: "I am asking you to recuse yourself under 170.1 because you ordered a petition to be filed on February 24th. I think there is an actual conflict here, where you are going from objective fact finder to prosecutor and I feel my client is being denied due process." Father later filed a section 170.1 motion and repeatedly moved for a mistrial based on this same alleged violation of due process. At closing

45

argument of the adjudication, DCFS and David's attorney recommended that the court sustain the petition.

After the adjudication and disposition orders were entered, father filed an application for rehearing alleging that the juvenile court had violated his due process rights by deciding the merits of a petition that it had ordered DCFS to file. According to father, the court's conduct demonstrated that it was "predisposed to sustain the petition."

2. *Father has failed to demonstrate that the juvenile court acted in excess of its authority or that he was prejudiced by any theoretical error*

The factual summary above demonstrates that several actions occurred before the court directed DCFS to file its section 342 petition within 72 hours. First, the court received a letter from Bissada indicating that the parents' conduct had greatly contributed to David's suicidal ideation and subsequent hospitalization; second, the court told the parties it intended to detain the child; third, County Counsel informed the court it agreed with this request in light of the evidence in the DCFS report and last minute information; fourth, the court ordered the child detained; fifth, father's counsel immediate requested that the court set a date for the adjudication; and sixth, the court scheduled the adjudication for March 16. After all of these events occurred, the court then directed DCFS to file its petition within 72 hours.

The course of events at the February 24th hearing demonstrate that all parties – including father – implicitly understood that DCFS intended to file a section 342 petition in light of the changed circumstances of the case. Section 342 states, in relevant part: "In any case in which a minor has been found to be a person described by Section 300 and the petitioner alleges new facts or circumstances, other than those under which the original petition was sustained, sufficient to state that the minor is a person described in Section 300, the petitioner shall file a subsequent petition." At the hearing, DCFS's counsel expressed its belief that detention was warranted based on the new information in Bissada's progress letter. Father, in turn, immediately requested an adjudication date, which the court set. Father's request for an adjudication, which DCFS did not oppose,

implicitly shows that both the father and the agency understood that a petition would be filed. After the adjudication was set, the court directed DCFS to file the petition within 72 hours and no party objected to or commented. Again, this silence suggests that all of the parties assumed that the agency intended to file a petition and that the court's order was merely meant to clarify that date by which it must be filed.

Even if we were to construe the court's instruction as an order to initiate a section 342 petition rather than order to file the petition within a certain time frame, father's claim would fail regardless of its legal merits. First, father has failed to demonstrate that he suffered any prejudice by the court's theoretical violation of the separation of powers doctrine. (See *People v. England* (2000) 83 Cal.App.4th 772, 780 & fn. 5 [rejecting "theoretical claim of a violation of separation of powers" where defendant failed to "demonstrate how he was prejudiced by any such violation"].) DCFS's conduct throughout the dependency proceedings show that it intended to file a section 342 petition regardless of whether it was ordered to do so. DCFS agreed that the court should detain David based on the changed circumstances of the case, it did not object or comment on the court's direction that it file a petition within 72 hours, it voluntarily prosecuted the petition at the adjudication and argued that the court should sustain the petition. All of this conduct shows that DCFS was in favor of pursuing and sustaining the section 342 petition regardless of the court's direction that it file the petition within 72 hours.

Second, the record demonstrates that father has forfeited any claim of error related to the court's purported violation of the separation of powers doctrine or statutory authority because he never raised these objections in the juvenile court. "A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court. [Citations.] (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221-222.) "Dependency matters are not exempt from this rule." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. omitted.) Forfeiture applies to claims of statutory error and to claims of violations of fundamental constitutional rights. (*In re Seaton* (2004) 34 Cal.4th 193, 198.) The purpose of the rule is to encourage parties to bring errors to the attention

of the trial court, so that the trial court has an opportunity to correct them. (*S.B., supra*, 32 Cal.4th at p. 1293.)

During the February 24th hearing, father did not object to the juvenile court's direction that DCFS file a new petition within 72 hours. Father also did not object to this instruction at any of the several hearings that preceded the adjudication. During the adjudication, father only referred to the court's direction that DCFS file the petition in the context of his objection that as a matter of due process, the court should recuse itself from deciding the merits of a petition that it had initiated through its own orders. Thus father did not assert – as he does now– that the court lacked authority to order DCFS to initiate the petition; he asserted only that the court should transfer the petition to another department to avoid any inherent bias. Had the father raised the separation of powers issue at the time the court directed DCFS to file the petition within 72 hours (or at any other time in the proceedings), the court and DCFS would have had an opportunity to consider the argument and, if necessary, take any actions necessary to resolve the purported error.

### C. Father was not prejudiced by the juvenile court's failure to abide by time limitations set forth in the Welfare and Institutions Code

Father contends that the juvenile court violated section 352 by granting numerous continuances that caused the disposition hearing to be completed more than 60 days after David was detained from parents without a finding of exceptional circumstances. When a child has been temporarily detained pursuant to a pending petition, section 334 requires that "the petition must be set for hearing within 15 judicial days from the date of the order of the court directing such detention." Section 352, subdivision (a), however, permits the juvenile court to "continue any hearing . . . beyond the time limit within which the hearing is otherwise required to be held, provided that no continuance shall be granted that is contrary to the interest of the minor." The court's authority to continue a hearing is subject to limitations set forth in section 352, subdivision (b), which states in relevant part: "Notwithstanding any other provision of law, if a minor has been removed

from the parents' or guardians' custody, no continuance shall be granted that would result in the dispositional hearing . . . being completed longer than 60 days after the hearing at which the minor was ordered removed or detained, unless the court finds that there are exceptional circumstances requiring such a continuance. The facts supporting such a continuance shall be entered upon the minutes of the court. . . ."

The parties do not dispute that: (1) the court ordered David temporarily detained on February 24th and scheduled the adjudication to commence on March 16; (2) over father's repeated objections, the court granted several continuances that delayed the start of the adjudication until May 3, which was more than 60 days after the date on which David was removed from his parents; (3) the court granted, again over father's objections, several additional continuances during the adjudication and disposition hearings, which did not conclude until June 25;[5] (4) the primary reason given for the delays was court congestion and attorney vacation schedules; and (5) the court never made a formal finding of exceptional circumstances justifying the continuances.

These uncontested fact demonstrate that the juvenile court violated the time limitations set forth in section 352. Before permitting any continuance that would result in the dispositional hearing being completed longer than 60 days after detention, the court was obligated to make a finding that exceptional circumstances justified the continuance, and set forth the facts supporting that finding. The court failed to do either. Instead, the court referred to "court congestion" and attorney vacations. Neither such justification qualifies as an "exceptional circumstance" within the meaning of section 352, subdivision (b). (See *Jeff M. v. SCLA* (1997) 56 Cal.App.4th 1238, 1243, fn. 4 (*Jeff M.*) ["court congestion" does not constitute "exceptional circumstance"]; *Renee v. SCLA* (1999) 76

---

[5] On May 11, 2012, father filed a petition for writ of mandate seeking an order requiring the juvenile court to either transfer the case to another department "capable of commencing the trial immediately," or direct the court to "conduct the trial, every court day . . .until the matter is fully adjudicated." On June 22, 2012, we issued a order dismissing the petition on mootness grounds based on a minute order indicating that juvenile court had completed the jurisdictional hearing on June 18, 2012.

Cal.App.4th 187, 197 [court's "vacation plans" do not constitute exceptional circumstances].)

The rights of a child, and his parents, to an adjudication within the statutory deadlines are not to be made secondary to either of these factors.

Although "[w]e are mindful that juvenile court judges, while diligent and caring, are overworked and doing their best to juggle ever-increasing caseloads while suffering grossly inadequate resources" (*Jeff. M, supra,* 56 Cal.App.4th at p. 1243), that does not relieve them of their obligations under section 352, subdivision (b). "In dependency matters such as this one, where the minors are living apart from their parents, it is particularly important that the validity of allegations justifying a temporary separation be adjudicated as quickly as possible. If they are not, and eventually the allegations are determined to lack merit, the relationship between the parents and the minors may be damaged severely. If that happens, the prospects for eventual reunification of the family are bleak." (*Renee, supra*, 76 Cal.App.4th at p. 197.) Given the precedence our Legislature has assigned to cases in which minors have been detained from their parents (see § 345), it is incumbent upon the superior courts to assign their resources in a manner that ensures compliance with section 352's time limitations.

However, we do not agree with father's contention that the failure to comply with section 352 requires us to "over turn the trial court['s]" jurisdictional and disposition orders. In the absence of some showing that the unauthorized delay actually impacted the outcome of the hearing, "a violation of the time limits of section 352, subdivision (b) . . . [does not require] . . . revers[al of] . . . the dispositional order." (*In re Angelique* (2003) 113 Cal.App.4th 509, 523 [explaining that "[s]ection 352 does not supply a penalty for noncompliance"]; see also *In re Richard H*. (1991) 234 Cal.App.3d 1351, 1362 [there is no "requirement that the [section 300] petition be dismissed if the [section 352, subdivision (b)] time limits are not met"].) In this case, father has not explained how the unauthorized delay impacted the outcome of the jurisdictional or disposition hearing, and the record contains substantial evidence supporting the court's rulings on those matters.

**DISPOSITION**

The juvenile court's orders are affirmed.

ZELON, J.

We concur:

PERLUSS, P. J.

WOODS, J.